UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

GARY MERTENS,

|  |  |  |
|---|---|---|
| | Plaintiff, | Civil Action No.: 13-11872 |
| | | Honorable Victoria A. Roberts |
| v. | | Magistrate Judge David R. Grand |

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [18, 21]

Plaintiff Gary Mertens brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions, which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.      RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge ("ALJ") erred in failing to give good reasons for rejecting a treating physician's medical opinion. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [21] be DENIED, Mertens' motion [18] be GRANTED IN PART AND DENIED IN PART and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be REMANDED to the ALJ for further consideration consistent with this Report and Recommendation.

## II.    REPORT

### A.    Procedural History

On September 29, 2011, Mertens filed an application for DIB, alleging disability as of August 10, 2010.  (Tr. 142-43).  The claim was denied initially on December 7, 2010.  (Tr. 78-81).  Thereafter, Mertens filed a timely request for an administrative hearing, which was held on November 2, 2011, before ALJ Timothy Scallen.  (Tr. 34-62).  Mertens, represented by attorney Samantha Ball, testified, as did vocational expert Elaine Tripi.  (*Id.*).  On November 18, 2011, the ALJ found Mertens not disabled.  (Tr. 17-33).  On February 21, 2013, the Appeals Council denied review.  (Tr. 1-7).  Mertens filed for judicial review of the final decision on April 25, 2013.  [1].

### B.    Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the

2

severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### C.    Background

#### *1.    Plaintiff's Reports and Testimony*

Mertens reported that the conditions preventing him from working are post-laminectomy in the lumbar region, accompanied by severe back pain, insomnia, migraines, anxiety and panic attacks and depression.  (Tr. 156).  Mertens reported that these conditions caused him to stop working as a frozen food stocker at a large retailer, a job that entailed frequently lifting more than 50 pounds.  (Tr. 156-57; 172).  In December 2008, Mertens underwent lumbar fusion surgery and was off work for a year before attempting to return, but testified that when he returned he could no longer perform the job due to problems with his back.  (Tr. 39).  Mertens reported that the heavy lifting and constant walking and bending of the job were very painful and caused him to be in constant pain.  (Tr. 179).  He reported that he often had to ask permission to leave work early due to his pain.  (Tr. 186).

3

Mertens reported being seen by a number of doctors for his conditions, including a mental health center, a surgeon, and two pain clinics, and taking a large number of medications including Celexa for depression, methocarbamol for back spasms, morphine and Vicodin for back pain, Neurontin for anxiety, verapamil for cluster migraines, Omerprazole for stomach ulcers and Remeron for insomnia. (Tr. 159-64). He reported taking the highest available dose of Vicodin and 100 mg of morphine twice a day for pain. (Tr. 40). He reported that his back pain upon waking was approximately 8-9 on a pain scale of 1-10, and is brought down to a 5-6/10 after his medications take effect. (Tr. 40). The pain is sometimes accompanied by back spasms that can last a day or two and radiate into his left leg. (Tr. 52-53). He testified that his medications make him groggy and unable to think clearly. (Tr. 40). He further testified to having tried numerous other treatments, including injections and stimulation. (Tr. 53).

Mertens reported that his cluster migraine headaches cause him to be bedridden sometimes between three to five hours at a time, although the medication he takes for them makes them less frequent. (Tr. 41). He testified that his migraines have recently become more frequent, occurring 3-5 times a day. (Tr. 49-50; 54-55). He further testified to undergoing rotator cuff surgery in both shoulders that makes it difficult to lift things or reach overhead. (Tr. 42).

Mertens reported that his daily activities include some household chores like making his bed and doing laundry, personal care, making simple meals and eating, watching television, performing back exercises, going outside, listening to music, and walking to the mailbox. (Tr. 51; 180-81). He reported being unable to change his sheets, carry heavy objects or clean his floors, and testified that his mother often helps him clean his apartment, where he lives alone. (*Id.*; 47). He also reported difficulty with washing his lower extremities and putting on socks.

4

(Tr. 180-81).  His mother assists him with grocery shopping.  (Tr. 183).  He testified that his pain interferes with his sleep at night, so he naps frequently throughout the day.  (Tr. 51).

Mertens reported being able to lift only ten pounds, stand or walk for 20-30 minutes and sit for 30 minutes before back pain and spasms force him to change position.  (Tr. 184).  He also has trouble reaching heavy objects, climbing stairs, squatting, bending and kneeling.  (*Id.*).  He reported needing to lie down at various times during the day to ease his back pain.  (Tr. 186).  During a September 10, 2010 interview with an agency representative, Mertens was observed repeatedly shifting in his chair "like he was uncomfortable."  (Tr. 153).  Mertens reported no problems with his ability to follow instructions, maintain attention or get along with others, although he noted that he does not deal well with stress due to his anxiety and panic attacks, and for the same reasons preferred not being around large crowds.  (Tr. 44-45; 184-85).  Mertens testified that his panic attacks can happen in public or even at home alone, and last between 5-15 minutes.  (Tr. 45).

## 2.    *Medical Evidence*[1]

### a.    *Treating Sources*

On December 31, 2008, Mertens underwent a fusion at the L3/L4 and L4/L5 levels in his lower back, after having failed conservative treatment for "quite severe" disc degeneration.  (Tr. 226-32).  In April 2009, Mertens underwent rehabilitative physical therapy, at the conclusion of which Mertens was found to have pain only at a rating of 3/10 and was able to lift and carry moderate loads with little difficulty.  (Tr. 439).  However, he was still "unable to perform normal work functions."  (*Id.*).  He was discharged from physical therapy because it was determined he could continue to address the remaining functional deficits with a home exercise program. (*Id.*).

---

[1] Because Mertens' motion only takes issue with the ALJ's decision as it relates to his lower back pain, the Court will limit its discussion of the medical evidence to that impairment.

In mid-2009, Mertens underwent a left shoulder arthroscopy, distal clavicle resection and rotator cuff repair.  (Tr. 216-218).  In the post-operative notes, by October 2009, Mertens was found to have made a 90% return to normal and was noted as lifting light weights, performing wall pushups and exercising two to three times a week.  (*Id.*).  Mertens did complain about his back during these visits, including once complaining of several days of muscle spasms.  (*Id.*).

At a visit with his primary care physician for an unrelated complaint in October 2009, Mertens reported pain and stiffness in his back.  (Tr. 251).  However, at two appointments in November 2009, Mertens complained only of pain in his right foot resulting from his waking "a lot" for his job at Walmart.  (Tr. 245; 248).  In February 2010, Mertens reported returning to work and lifting, causing lower back pain and stiffness with no radiation.  (Tr. 242).  Upon exam, his gait was normal and he was diagnosed with lower back pain that was mechanical in nature and secondary to standing and lifting, and he was prescribed Valium and Vicodin.  (Tr. 244).  Mertens returned to his primary care physician in March 2010, again complaining of lower back pain without radiation, but that increased with bending.  (Tr. 239).  Upon exam, his gait was normal, but his joints, bones and muscles in his legs were abnormal.  (Tr. 241).  He was also found to have pain with range of motion.  (*Id.*).  He was prescribed Percocet.  (*Id.*).

In April 2010, Mertens was treated by neurosurgeon Richard Veyna.  (Tr. 237).  At the time of the appointment, Mertens reported working full-time in the freezer, and that the cold makes his back "more achy."  (*Id.*).  He had a normal neurological exam and good range of motion in his back.  (*Id.*).  The doctor acknowledged that Mertens benefited from surgery but "still has ongoing issues that will need to be addressed over the course of his lifetime."  (*Id.*).  Dr. Veyna recommended weaning Mertens off the large amount of Vicodin he was taking.  (*Id.*).  Mertens returned to Dr. Veyna in June 2010 where the doctor spent most of the visit discussing

narcotic usage and how to wean off of them.  (Tr. 236).

Mertens again treated with Dr. Veyna in July 2010, where he reported that his continued employment duties, including working in a freezer and lifting heavy things, were causing increased pain episodes.  (Tr. 324).  Mertens reported considering disability and Dr. Veyna stated he was "happy to support him."  (*Id.*).  Upon exam, Mertens appeared in mild distress, but the remainder of the neurological exam was non-focal.  (*Id.*).  Dr. Veyna increased his OxyContin dosage and renewed his Vicodin prescription.  (*Id.*).

In August 2010, Mertens referred himself to a pain clinic for additional treatment.  (Tr. 254).  Mertens reported being in "unbearable and miserable pain" that was "80% back and 20% leg," was "constant and worse with activities such as standing, bending, twisting, [and] sitting for prolonged periods of time."  (*Id.*).  He reported some radicular pain over the L5-S1 distribution. (*Id.*).  He also reported that his pain caused insomnia, lethargy and loss of appetite.  (*Id.*).  His pain score was 6/10 at rest and 8/10 during activity.  (*Id.*).  An exam revealed facet joint pain, a positive straight leg raising test, sensory deficit in the form of abnormal reflexes, full lower extremity strength, and a positive straight leg raising test.  (Tr. 256-57).  Mertens was scheduled for an epidural injection and a facet joint injection and advised to continue his current medications.  (Tr. 257-58).

That same month, Mertens returned to Dr. Veyna stating that he twisted his back again at work and that he has decided not to return to work and seek disability.  (Tr. 375).  An exam revealed Mertens in no distress, with a good range of motion and ambulating unassisted.  (*Id.*). Dr. Veyna stated that he did "not think it is any longer possible for [Mertens] to continue to lift heavy loads while at work," and that he believed Mertens was "permanently completely disabled form any type of physical activity that involves that type of strenuous lifting or prolonged

standing or walking." (*Id.*). Dr. Veyna went on to opine that Mertens was "at the point where lifting more than 10 pounds is prone to give him difficulty." (*Id.*). Dr. Veyna then took Mertens off work. (*Id.*).

On October 6, 2010, Mertens underwent a facet joint block and a lumbar epiduragram and epidural. (Tr. 320-21). Mertens returned to Dr. Veyna on October 27, 2010. (Tr. 322-23). He reported that the injections were working, although the effect was temporary and he continues to struggle with daily back pain. (Tr. 322). Upon exam, Mertens appeared in mild distress. (*Id.*). He had good strength, a restricted range of motion, and was ambulating slowly but without an assistive device. (*Id.*). Dr. Veyna concluded that Mertens was "certainly not capable of any further work at this point," due to a need for "significant amounts of downtime throughout the day" and that he would "even have to intermittently change positions such as from a sitting to a lying position throughout the day." (*Id.*). Dr. Veyna thought Mertens would be a good candidate for a spinal cord stimulator. (*Id.*).

In December 2010, Mertens underwent a second lumbar epiduragram and epidurolysis, as well as facet nerve stimulation. (Tr. 318-19). He subsequently treated with pain management on December 15, 2010 where he reported only 30% relief from the treatments. (Tr. 313). Mertens reported severe intractable pain with radiation into his lower extremities. (*Id.*). Upon exam, Mertens was noted to have paravertebral muscle spasms at L2-L5 with facet joint pain at the same location that increased on extension and lateral rotation. (Tr. 314). A straight leg raising test was positive, abnormal reflexes were seen over the ankle and knee joints, but Mertens was found to have full strength in his lower extremities. (*Id.*). Dr. Vakhariya diagnosed him with failed back syndrome and recommended implantation of a spinal cord stimulator and referred to physical therapy. (Tr. 313; 315). The stimulator was implanted on January 5, 2011. (Tr. 316-

17).  At a follow-up on January 7, 2011, Mertens reported that the stimulator helped with his back pain but that he did not like the way it stimulated his lower extremities, and asked that it be removed.  (Tr. 309).  Dr. Vakhariya noted that Mertens had failed conservative treatment and had severe functional impairment including difficulty walking, sitting, standing or bending, with associated numbness and subjective weakness in the lower back and occasionally in the lower extremities  (*Id.*).  Exam results were the same as at his last appointment, and the doctor continued his medications and recommended physical therapy.  (Tr. 310-12).

Mertens returned to Dr. Vakhariya on February 9, 2011, where his exam findings were the same as at the previous appointments and Dr. Vakhariya discontinued all opioids and began Mertens on a Methadone trial.  (Tr. 305-308).  Mertens returned on February 15, 2011, stating that he discontinued the Methadone due to leg swelling, and wished to restart his prior medication regimen.  (Tr. 301-304).  Exam results were unchanged from prior visits and Mertens was restarted on OxyContin, Vicodin and Soma for spasms.  (Tr. 303).  At a follow-up in March 2011, Mertens continued to display the same exam results, and Dr. Vakhariya increased his OxyContin dosage.  (Tr. 297-300).  At this appointment, Dr. Vakhariya noted that Mertens had failed physical therapy even though he continued to advise it.  (Tr. 297-99).  At a follow-up in April 2011, Mertens reported severe pain including radiation into his lower extremities all the way to his feet, accompanied by numbness and tingling.  (Tr. 293).  He reported receiving moderate relief from his current regimen and that he was "doing well without any side effects." (*Id.*).  Exam findings were unchanged.  (Tr. 294).

Mertens returned to Dr. Vakhariya in June 2011.  (Tr. 409-12).  At that point he was taking 100mg of MS Contin with Vicodin for breakthrough pain every 4-6 hours, and was doing well on this regimen with "better functional relief."  (Tr. 409).  Exam findings remained

unchanged and Mertens was advised to continue with his current medications.  (Tr. 411).  At an appointment with his neurologist for headaches also in June 2011, Mertens was noted to have good strength in his arms and legs, normal tone, symmetrical reflexes and normal sensation.  (Tr. 371).  His gait was found to be "slightly off secondary to his back fusion," his heel and toe walking "adequate" and his tandem gait "cautious."  (*Id.*).  At a follow-up in July 2011 with Dr. Vakhariya, Mertens reported stopping his MS Contin due to leg swelling and tearing up the script.  (Tr. 405).  Dr. Vakhariya advised Mertens that he would no longer be able to receive that medication due to the clinic's narcotics policy.  (*Id.*).  Physical examination findings remained unchanged from previous appointments.  (Tr. 406).  The doctor continued Mertens' Vicodin and gave him Valium for break through spasms.  (Tr. 407).

Mertens returned in August 2011 noting only minimal relief with his regimen of Vicodin and Valium.  (Tr. 401).  Examination findings were again unchanged from previous appointments.  (Tr. 402).  Dr. Vakhariya continued Mertens' medications and added a Fentanyl patch.  (Tr. 403).  Mertens returned to the pain clinic in September 2011 reporting that the Fentanyl patch was not giving much relief and requesting a medication change.  (Tr. 397).  He further reported that the pain was interfering with his daily activity.  (*Id.*).  An exam revealed spasm over L3-S1 paravetebrae facet loading in lumbar spine with extension and lateral rotation.  (Tr. 398).  A straight leg raising test was positive, sensory deficits were noted as reflexes were found abnormal in the ankle and knee.  (*Id.*).  However, Mertens' lower extremity strength remained 5/5.  (*Id.*).  The doctor again prescribed MS Contin.  (Tr. 399).

        b.    *Consultative and Non-Examining Sources*

On November 1, 2010, Mertens underwent a physical consultative examination with Dr. L. Banerji.  (Tr. 274-81).  The examination revealed that Mertens could stand without support,

there was no loss of lumbar lordosis, and no tenderness over the spine. (Tr. 275). However all movements of the lumbar spine were "painful and restricted," and a straight leg raising test was 30 degrees on both sides with complaints of pain. (*Id.*). Some movement was also restricted over the hip and knee joints, but there was no muscle wasting and Mertens' grip strength was 5/5. (Tr. 276). Mertens was found to ambulate in short, slow spaces, could not walk tip toe, heal or tandem and could not squat more than 50 percent due to pain and limitation in movement. (*Id.*). He could get up from lying down and on and off the table without help and could dress and undress and open the door without assistance. (*Id.*). His superficial reflexes were normal while his deep reflexes were "sluggish all over." (*Id.*). The doctor diagnosed Mertens with status post lumbar laminectomy and discectomy, status post surgery for rotator cuff syndrome in both shoulders, post-traumatic osteoarthritis of the lumbar spine. (*Id.*). The doctor did not find any abnormal physical finding related to Mertens' subjective complaint of migraines. (*Id.*). The doctor concluded that Mertens was "suitable for work eight hours a day but should avoid prolonged walking, standing, lifting of heavy weight, climbing ladders, and scaffolding due to osteoarthritis of the lumbar spine and pain in both shoulder joints." (*Id.*).

### 4.     *Vocational Expert's Testimony*

The VE testified that Mertens' past relevant work as a store laborer would be classified as medium and unskilled, and his work as a groundskeeper would be classified as heavy and unskilled. (Tr. 57). The ALJ then posed the following hypothetical, asking the VE to consider a claimant of Mertens' age, education, vocational background, who was limited to light work

> with a sit/stand option. Also limited to occasional climbing of stairs and ramps; no climbing of ropes, ladders and scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; frequent foot controls; also limited to no overhead reaching; also limited to avoiding concentrated exposure to extreme heat, cold, damp, dampness, and extreme lit conditions; also limited to simple, routine, repetitive tasks; as well as

11

occasional interaction with the public and coworkers.

(Tr. 58).  The VE testified that such an individual could not perform Mertens' past relevant work, but would be able to perform other jobs in the national economy including visual inspector, hand packager and assembler, which combined comprised approximately 10,000 jobs in the local region.  (*Id.*).

The ALJ then modified the hypothetical to limit the claimant to sedentary work.  (Tr. 59). The VE found that such a claimant could still perform the jobs of sorter, final assembler and bench hand, which combined comprised approximately 5,000 in the local economy.  (*Id.*).  When asked if the hypothetical claimant could take more than the routine number of breaks or absences, the VE testified that such an option would not be tolerated in the workplace.  (*Id.*).

**D.     The ALJ's Findings**

Following the five-step sequential analysis, the ALJ concluded that Mertens was not disabled.  At Step One he determined that Mertens had not engaged in substantial gainful activity from his alleged onset date through his date-last-insured, September 30, 2011.  (Tr. 22).  At Step Two he found the following severe impairments:  "cluster headaches; status post rotator cuff surgeries with degenerative joint disease; degenerative disc disease/osteoarthritis; depression." (*Id.*).  At Step Three, the ALJ concluded that none of Mertens' impairments, either alone or in combination, met or medically equaled a listed impairment, specifically considering Listings 1.02, 1.04, 1.06, and 12.04.  (Tr. 23).  As part of this step, the ALJ found that Mertens had moderate limitations in activities of daily living, social functioning and maintaining concentration, persistence and pace, with no repeated episodes of decompensation.  (*Id.*).  Next, the ALJ assessed Mertens' RFC, finding him capable of:

> sedentary work . . . with the following additional limitations: no more than
> occasional climbing of stairs, or ramps and no climbing of ladders, ropes,

12

> or scaffolding; no more than occasional balancing, stooping, kneeling, crouching, or crawling; sit/stand option; no overhead reaching; avoid concentrated exposure to extreme heat and cold, as well as to dampness and extreme light; simple, routine, repetitive tasks involving no more than occasional interaction with co-workers or the general public.

(Tr. 24). At Step Four the ALJ found that Mertens could not perform his past relevant work under the RFC assessed. (Tr. 27). However, the ALJ found at Step Five that Mertens could perform a substantial number of other jobs in the national economy based on his age, education, vocational background and RFC, and thus he was not disabled through his date last insured. (Tr. 28-29).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide

13

questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.      Analysis

Mertens argues that the ALJ erred in assessing his credibility in light of the significant medical evidence of his lower back pain and loss of function, and that the RFC the ALJ formed did not account for all of Mertens' credible limitations, including ones imposed by his treating physician, Dr. Veyna, that he needed to lie down frequently during the day and to take naps. The Court finds merit to Mertens' latter argument.

14

An ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) *quoting* 20 C.F.R. § 404.1527(d)(2).  If an ALJ declines to give a treating physician's opinion controlling weight, she must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) *citing Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2).  The ALJ must give good reasons, supported by substantial evidence in the record, for the ultimate weight given to a treating source opinion. *Id.*, *citing Soc. Sec. Rul*. 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188 at *5.  An ALJ is not required to give any special weight to a treating source's conclusion that a claimant is disabled, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record.  20 C.F.R. § 404.1527(e)(1), (e)(3).

On October 27, 2010, Dr. Veyna opined that, based on Mertens' continued failure to respond to treatment, including only receiving temporary relief from injections, he was unable to work.  (Tr. 322).  Dr. Veyna noted that Mertens would require "significant amounts of downtime throughout the day and even have to intermittently change positions such as from a sitting to a lying position throughout the day." (*Id.*).  Dr. Veyna went on to state that he was "not certain that any type of employment would be able to do that for him." (*Id.*).  The ALJ rejected giving controlling weight to Dr. Veyna's opinion for only one reason – that there was no evidence that Dr. Veyna was familiar with the Administration's definition of "disabled" and that it was not

15

clear whether he was simply talking about Mertens being disabled from his prior employment or all employment. (Tr. 26). While this was a "good reason" to reject Dr. Veyna's opinion on the ultimate issue of disability (which is always reserved to the Commissioner), it was not a valid reason for rejecting the doctor's opinion regarding Mertens' physical impairments.

Whether there exists evidence that Dr. Veyna is familiar with the Administration's definition of disability is beside the point.[2] Dr. Veyna did not simply opine that Mertens was "disabled" or could not work, opinions which only the ALJ may render. 20 C.F.R. § 404.1527(e)(1), (e)(3). Rather, he imposed specific limitations – namely, a significant amount of downtime and the ability to intermittently change positions from sitting to lying down – which, if included by the ALJ in his RFC or his hypothetical to the VE, may well have resulted in a finding of disability. (Tr. 322).[3] The ALJ's reason for rejecting Dr. Veyna's opinion does not touch on the credibility of those limitations. (Tr. 26). Thus, the ALJ essentially gave no reason at all for not incorporating those limitations. This was error and was inconsistent with the requirements for proper evaluation under the treating physician rule as discussed above. *See supra* at 15. Because Dr. Veyna's unfamiliarity with the Administration standard for disability is

---

[2] Though also irrelevant to this Court's consideration for the reasons discussed below, it notes that Dr. Veyna's opinion made fairly clear that he believed Mertens would be disabled from all work (not just his past work) because he could not imagine a job that would accommodate the limitations he was imposing.

[3] Indeed, on numerous occasions this Court has reviewed VE testimony that the imposition of such limitations precludes all competitive employment. *See e.g. Klink v. Comm'r of Soc. Sec.*, No. 12-15172, 2014 U.S. Dist. LEXIS 29707, *12 (E.D. Mich. Feb. 18, 2014) (VE testified that need to nap or lie down outside typical breaks would generally preclude employment); *Foster v. Comm'r of Soc. Sec.*, No. 13-10813, 2014 U.S. Dist. LEXIS 39422, *16 (E.D. Mich. Feb. 28, 2014) (need to lie down for two hours at unpredictable intervals would preclude employment); *Mitchell v. Astrue*, No. 08-13301, 2009 U.S. Dist. LEXIS 78258, *12 (E.D. Mich. July 29, 2009) (need to lie down twice a day for 20 minutes to an hour would preclude all gainful employment); *McKitrick v. Comm'r of Soc. Sec.*, No. 10-2623, 2011 U.S. Dist. LEXIS 150022, *8 (N.D. Ohio Dec. 30, 2011) (VE testified if claimant were off task more than 15% of work time or needed several breaks for an extended period of time, it would preclude employment).

an insufficient reason to reject the remainder of his opinion regarding Mertens' functional limitations, and because the ALJ did not give any other reason for rejecting that opinion, his decision is not supported by substantial evidence of record.

The Court rejects the assertion that "Dr. Veyna's [opinions regarding these limitations] are taken into account in the residual functional capacity" imposed by the ALJ. (Tr. 26). While the ALJ may have incorporated some of Dr. Veyna's prior limitations into this RFC, such as those mentioned in Dr. Veyna's August 2010 treatment notes including an inability to lift more than 10 pounds and no prolonged standing or walking, (Tr. 375), Dr. Veyna's October 2010 opinion included limitations that Mertens would need a significant amount of downtime and the ability to alternate between sitting and lying down. (Tr. 322). There is nothing in the RFC that accounts for these limitations. (Tr. 24). Furthermore, the ALJ's statement that no doctor indicated that Mertens was disabled or issued limitations greater than those determined in the decision is inaccurate given the above discussion. (Tr. 27).

Because the ALJ failed to give good reasons for rejecting whole-cloth Dr. Veyna's opinion regarding Mertens' functional limitations, his RFC and hypothetical questions to the VE did not include all of Mertens' credible limitations. While ultimately the ALJ will need to evaluate these opinions of Dr. Veyna under the treating physician rule's standards before deciding how, if at all, his RFC assessment will change, the Court cannot say that the ALJ's failure to do so in the first instance was harmless error. This is because the VE testified that if a hypothetical claimant needed to take more than the normal number of breaks, it would preclude competitive employment. (Tr. 59). *See also* fn. 3.

Because the Court cannot conclude that the RFC the ALJ provided to the VE encompasses all of Mertens' credible limitations, it cannot conclude that the VE's testimony that

17

Mertens could perform a limited amount of sedentary work is supported by substantial evidence. Accordingly, the ALJ's decision that Mertens was not disabled is not supported by substantial evidence and must be remanded for further consideration.[4]

## III.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Mertens' Motion for Summary Judgment **[18]** be **GRANTED IN PART** to the extent it seeks remand to the ALJ, but **DENIED IN PART** to the extent it seeks outright reversal and an award of benefits, the Commissioner's Motion **[21]** be **DENIED** and this case be **REMANDED** for further consideration consistent with this Report and Recommendation.

Dated: June 19, 2014                          s/David R. Grand
Ann Arbor, Michigan                       DAVID R. GRAND
                                                          United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991);

---

[4] Because the Court finds that the ALJ's failure to give good reasons for rejecting Dr. Veyna's opinion renders his decision unsupported by substantial evidence, the Court need not reach the other issues Mertens raises in his brief.

*Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to

E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 19, 2014.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager